## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

|  |  |
|---|---|
| GINA B. DERISO<br><br>　　　　　　　Plaintiff,<br><br>– against–<br><br>HYUNDAI CAPITAL AMERICA, INC., d/b/a KIA MOTORS FINANCE | Civil Action No. 22cv80807 |

### COMPLAINT

**NOW INTO COURT,** through undersigned counsel, GINA B. DERISO, the Plaintiff herein and hereby files this Complaint against Defendant, HYUNDAI CAPITAL AMERICA, INC., d/b/a KIA MOTORS FINANCE, and alleges as follows:

### PRELIMINARY STATEMENT

1.　This is an action for actual and statutory damages for violations of the Fair Credit Reporting Act (hereinafter, "FCRA"), 15 U.S.C. §1681, *et. seq.*

1

## JURISDICTION & VENUE

2.    Jurisdiction arises under the Fair Credit Reporting Act 15 U.S.C. §1681, *et. seq.,* and pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1337.

3.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b).

## PARTIES

4.    GINA B. DERISO (hereinafter, "Ms. Deriso") is an individual who was at all relevant times residing in the County of Palm Beach, State of Florida.

5.    At all relevant times, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. §1681a(c)

6.    HYUNDAI CAPITAL AMERICA, INC., d/b/a KIA MOTORS FINANCE (hereinafter, "Defendant" and/or "KIA FINANCE") is a business entity that  provides automobile financing to consumers. Defendant's principal place of business is located in the State of California   Defendant is incorporated in the State of California.

7.    At all relevant times, Defendant was a "person" as that term is defined by 15 U.S.C. §1681a(b).

2

8.     At all relevant times, credit reports as alleged in this

pleading are "consumer reports" as that term is defined by 15

U.S.C. §1681a(d).

## STATUTORY FRAMEWORK

### *The Fair Credit Reporting Act*

9.     The Fair Credit Reporting Act, 15 U.S.C. §1681 et. seq., was

originally enacted in 1970 for the purpose of regulating the

collection, dissemination, and use of consumer credit information.

10.     Congress found that "[i]nnacurate credit reports directly

impair the efficiency of the banking system, and unfair credit

reporting methods undermine the public confidence which is

essential to the continued functioning of the banking system." 15

U.S.C. §1681(a)(1).

11.     "The aim of the Fair Credit Reporting Act is to see that the

credit reporting system serves the consumer as well as the industry.

The consumer has a right to information which is accurate; he has

a right to correct inaccurate or misleading information; he has a

right to know when inaccurate information is entered into his file;

he has a right to see that the information is kept confidential and is

used for the purpose for which it is collected; and he has a right to

be free from unwarranted invasions of his personal privacy." The Fair Credit Reporting Act seeks to secure these rights." Hearings on S. 823 Before the Subcomm. on Financial Institutions of the S. Comm. on Banking and Currency, 91st Cong. 2 (1969).

12.   A "furnisher of information" provides information about consumers' credit history to credit reporting agencies. 15 U.S.C. §1681s-2.

13.   "Furnishers of information" under the FCRA, pursuant to 15 U.S.C. §1681s-2(b) to conduct a reasonable investigation into each of the written disputes that it receives from the credit reporting agencies. See also *Hinkle v. Midland Credit Mgmt., Inc.,* 827 F.3d 1295, 1302 (11th Cir. 2016).

14.   Congress also found that "[c]onsumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers" and that "[t]here is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(3),(4).

15.   The FCRA requires credit reporting agencies to "follow reasonable procedures to assure maximum possible accuracy of"

4

consumer reports. 15 U.S.C. § 1681e(b). If a consumer disputes information contained in their credit report, the FCRA requires a credit reporting agency to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller."15 U.S.C.S. § 1681i(a)(1)(A).

16.   In performing the reinvestigation, the FCRA requires a credit reporting agency to "review and consider all relevant information submitted by the consumer in the period described in paragraph (1)(A) with respect to such disputed information."15 U.S.C.S. § 1681i(a)(4).

17.   If the disputed information is inaccurate or incomplete or cannot be verified, the consumer reporting agency "shall...(i) promptly delete that item of information from the file of the consumer, or modify that item of information, as appropriate, based on the results of the reinvestigation; and (ii) promptly notify the furnisher of that information that the information has been

modified or deleted from the file of the consumer." 15 U.S.C. § 1681(a)(5)(A)(i),(ii).

18.   The FCRA provides a private right of action against any person that violates the provisions of the FCRA. 15 U.S.C. §§ 1681o, 1691n.

19.   If the violation is negligent, the FCRA allows the consumer to recover actual damages (§ 1681o(a)); however, if the violation is willful, the consumer may recover any actual damages or statutory damages from not less than $100.00 and not more than $1,000. § 1681n(a).

20.   Under the FCRA, the term "consumer report" generally refers to:

> any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for:
>
> > i.   credit or insurance to be used primarily for personal, family, or household purposes;
> >
> > ii. employment purposes; or

iii. any other purpose authorized under section 1681b of this title.

15 U.S.C. § 1681a(d)(1).

21.   The terms "consumer report", "credit report", and "consumer credit report" are used synonymously herein.

## **ALLEGATIONS**

### ***Credit Risk Scores aka 'Credit Scores'***

22.   The Fair Isaac Corporation credit risk scoring system, commonly referred to as "FICO", is the leading credit scoring system and utilizes data reported by credit reporting agencies. See https://www.myfico.com/credit-education/credit-scores  (last visited June 2, 2022).

23.   The Fair Isaac Corporation uses the data in consumer reports to calculate consumers' credit scores (also known as credit risk scores). *Id.*

24.   The term "credit score" is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default. Consumer Financial Protection Bureau, Supervision and Examination Manual,

Version 2 (October 2012), p. 99, archived at

https://perma.cc/JF32-RFAA

http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-

examination- manual-v2.pdf   (last accessed on June 2, 2022).

25.   The cost of credit (e.g., interest rates, fees, etc.), the
availability of credit, ratings for insurance products, and even
unsolicited credit offers, such as the opportunity to refinance a
mortgage at a lower interest rate, extended financing periods and
lower rate auto loans, and even zero-percent financing credit offers
for in-store credit lines, are all, by and large, driven by a
consumer's credit score.

26.   FICO scores are calculated from five main categories of
credit data in a consumer's credit report. Those categories, and
their weighted values, are as follows: payment history accounts for
35% of a consumer's FICO score; debt/amounts owed accounts for
30% of a consumer's FICO score; age/length of credit history
accounts for 15% of a consumer's FICO score; new credit/recent
inquiries accounts for 10% of a consumer's FICO score; and mix of
accounts/types of credit accounts for 10% of a consumer's FICO
score. *See* https://www.myfico.com/credit-education/whats-in-

your-credit-score (last accessed June 2, 2022).

27.   The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

28.   Inaccurate or incorrect credit reporting very often results in a lower FICO and other credit scoring model scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

29.   There is no established rule or threshold for classifying the significance of a credit score change as minor or major because the impact of a change in score is dependent on the current score. For example, a twenty-five-point change in a credit score that keeps the consumer in a particular credit risk category may not have a large impact on the person's likelihood of receiving credit. However, a one-point change in credit score that moves the consumer from one risk tier to the next may have a large impact on the consumer's

9

access to credit or the products and rates the consumer is able to secure.

30.   The Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score. See https://www.myfico.com/credit-education/questions/fix-errors-on-credit-report archived at https://perma.cc/9TQN-S5WP (last visited June 2, 2022).

### *The CDIA Metro 2 Credit Reporting Standards*

31.   The reporting of consumer credit information, by CRAs and data furnishers, is the foundation of credit risk scoring and impacts the financial lives of consumers by giving them access to loans and bank products that they need. See https://www.cdiaonline.org/for-consumers/credit-reporting-overview/ (last visited June 2, 2022).

32.   Moreover, the significance of credit reporting and the value attached to one's "credit in this day and age is one of his most valuable assets and without it, a substantial portion of the American people would be without their homes, washing machines, refrigerators, automobiles, television sets, and other mechanical paraphernalia that are now regarded as necessities of life." *Am. Fire*

*& Cas. Co. v. Davis,* 146 So. 2d 615, 619 (Fla. 1st DCA 1962)."

33.   The Consumer Data Industry Association ("CDIA") is an international trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services, and the CDIA is active in both federal and state legislative affairs, public relations, education, and the promulgation of industry standards.

34.   Because consumer credit reporting information is such sensitive data that has far reaching implications for most, if not all, consumers, the CDIA works together with CRAs to develop, maintain and enhance industry-standard reporting formats and guidelines.

35.   On May 20, 2015, Ohio Attorney General Mike DeWine and thirty (30) other state attorneys general announced a national settlement ("The Settlement") with the CRAs. Attorney General DeWine Announces Major National Settlement with Credit Reporting Agencies, Ohio Att'y Gen. (May 20, 2015), https://www.ohioattorneygeneral.gov/Media/News-Releases/May-2015/Attorney-General-DeWine-Announces-Major-National-S , last

visited June 2, 2022.

36.   The Settlement implemented numerous reporting standards, including the Metro 2, data reporting format. *See* Assurance of Voluntary Compliance/Assurance of Voluntary Discontinuance, *In the Matter of Equifax Info. Servs. L.L.C., Experian Info. Sols., Inc., and TransUnion L.L.C.,* § IV (E)(2)(May 20, 2015).

37.   To further assist CRAs and data furnishers with performing their due diligence and reporting accurate, complete, and timely data, in satisfaction of the FCRA's legal requirements, the CDIA offers extensive training, education, and support to CRAs and data furnishers.

38.   The CDIA's extensive training and support offerings include FCRA certification programs for both CRAs and data furnishers, to assist each in maintaining compliance with FCRA regulations.

39.   If the standardized methods proscribed by the CDIA are not followed, FCRA certification can be revoked for failure to adhere to such standards.

40.   In cooperation with the major CRAs, CDIA publishes the Metro 2 ("Metro 2") reporting standards to assist furnishers with their compliance requirements under the FCRA. CDIA's reporting

12

products are used in more than nine billion transactions each year.
See, https://www.cdiaonline.org/resources/furnishers-of-data-
overview/metro2-information/ (last accessed June 2, 2022).

41.    The Metro 2 Format Task Force is comprised of
representatives from Equifax, Experian, Innovis, and TransUnion,
and is supported by the CDIA. Metro 2 Format Task Force's mission
is to provide a standardized method for the reporting of accurate,
complete, and timely data, and has developed the Metro 2
standards. See https://www.cdiaonline.org/metro-2/ (last visited
June 2, 2022).

42.    To ensure compliance with the FCRA, and in furtherance of
its mission, the Metro 2 Format Task Force has developed an
industry standard (the "Metro2 standard") for reporting consumer
accounts that is "designed to standardize a wide range of credit
information while complying with federal laws and regulations for
credit reporting." *Id.*

43.    15 U.S.C. § 1681s-2(a)(2) requires furnishers of information
to regularly correct and update the information they previously
provided to consumer reporting agencies, to make sure the
information is complete and accurate. Similarly, upon receiving

13

notice from a consumer reporting agency of a consumer's dispute,
15 U.S.C. § 1681s-2(b)(1) requires furnishers of information to
conduct reasonable investigations of a consumer's dispute of the
completeness or accuracy of any information provided by the
furnisher of information to a consumer reporting agency.

44.    15 U.S.C. § 1681e(b) requires consumer reporting agencies
to follow reasonable procedures to assure maximum possible
accuracy of information concerning the individual about whom a
report relates. Similarly, 15 U.S.C. § 1681i(a)(1) requires consumer
reporting agencies to conduct reasonable reinvestigations of a
consumer's dispute of the completeness or accuracy of any item of
information contained in the consumer's file.

45.    The uniform adoption and implementation of the Metro 2
standards is the primary vehicle by which CRAs and furnishers
ensure compliance with their respective duties to maintain complete
and accurate information under the FCRA.

46.    The Metro 2 standards provide uniformity in the reporting
and interpretation of credit data, including credit risk scoring.

47.    The Metro 2 standards are documented in the Credit
Reporting Resource Guide ("CRRG"), an industry-standard

14

publication produced and distributed by the CDIA.

48.   As an integral aspect of its duties under the FCRA, KIA FINANCE is required to have in place adequate and reasonable policies and procedures for handling and investigation of disputed information.

49.   At all times relevant hereto, KIA FINANCE adopted and implemented the Metro 2 format as a means of fulfilling its duties under the FCRA.

50.   Furthermore, at all times relevant hereto, KIA FINANCE, warranted, and or represented to all CRAs to which it reported that it had adopted and implemented the Metro 2 format for its reporting of consumer data, and would otherwise comply with Metro 2 and CDIA guidelines in their reporting of consumer information.

***National CRAs and Furnishers Communicate Consumer Disputes and Responses via the E- Oscar Reporting Platform***

51.   The FCRA requires CRAs to implement an automated reinvestigation system through which furnishers of information to the CRA may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file. 15 U.S.C. § 1681i(a)(5)(D).

52.   To comply with the automated dispute reinvestigation requirements of the FCRA, Trans Union, Equifax, and Experian (the three major "National CRAs"), along with Innovis Data Solutions, Inc., developed and implemented a browser- based software system that allows the CRAs to electronically notify furnishers quickly and easily of disputed credit reporting information, and for furnishers to quickly and easily respond to such disputes following the furnisher's investigation of the disputed information.

53.   The system is commonly referred to as e-OSCAR (Online Solution for Complete and Accurate Reporting) and was designed to be Metro 2 compliant. See http://www.e-oscar.org/ (last accessed June 2, 2022).

54.   The e-OSCAR system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Data Form ("AUD") processing, as well as other consumer- dispute-related processes. *Id.*

55.   The National CRAs, provide notice of a consumer's dispute to data furnishers in the ACDV format, and forward the ACDV to the furnisher through e- OSCAR.

16

56.   If a furnisher's investigation of a consumer's dispute determines that the information in dispute is incomplete or inaccurate, the FCRA requires the furnisher to correct the information not only with the CRA that sent the ACDV, but with all other CRAs to whom the furnisher reported that information. 15 U.S.C. § 1681s-2(b)(1)(D).

57.   The e-OSCAR system facilitates the furnisher's compliance with 15 U.S.C. § 1681s-2(b)(1)(D) by sending a "Carbon Copy" of an ACDV response "to each CRA with whom the [furnisher] has a reporting relationship" in addition to the response to the initiating CRA. See  https://www.e-oscar.org/getting-started/about-us (last accessed June 2, 2022).

58.   Additionally, a furnisher can manually correct a tradeline with a CRA other than the one that initiated a dispute by sending an AUD within e-OSCAR.

59.   Trans Union, Experian, and Equifax each require data furnishers that report to them respectively to register with and use e-OSCAR, and states that e-OSCAR is "in compliance with FCRA and Metro 2 standards." See, https://www.transunion.com/data-reporting/support-teams (last accessed June 2, 2022).

17

## GINA B. DERISO LEASES A
## DEFECTIVE and DANGEROUS KIA SORENTO

60.     On August 26, 2015, Ms. DeRiso leased a 2016 Kia
Sorento from Hyundai Motor Company, Hyundai Motor America,
KIA Motors Corporation, and/or KIA Motors America, Inc. the
leased was financed by Defendant, KIA FINANCE.

61.   On or around June 30, 2017, Ms. DeRiso was driving
northbound on 1-95 going approximately 75 miles per hour when
this horrific shrieking metal sound came from her car.

62.   The car suddenly had no power and Ms. DeRiso was
forced to try to maneuver her way through high-speed cars off I-95
to safety on the side of the road.

63.   The car had lost power steering and it was a terrifying event
for Ms. DeRiso. It was miracle Ms. DeRiso was not hit.

64.   Ms. DeRiso waited on the side of the road for a tow truck
to take her to the dealership.

65.   When Ms. DeRiso advised the tow truck driver as to what
happened, in response he said this was his 4th or 5th Kia he towed
in this week with the same problem.

18

66.    Coincidentally, Ms. Desiro received a Notice of Proposed Class Settlement due to the fact that Hyundai Motor Company, Hyundai Motor America, KIA Motors Corporation, and KIA Motors America, Inc. were selling dangerous vehicles where there was a defect that caused engine seizure, stalling, engine failure and engine fire, which if experienced "*can be dangerous.*"  A copy of the Notice of Proposed Class Settlement is attached hereto as **Exhibit "A."**

67.    Hyundai Motor Company, Hyundai Motor America, KIA Motors Corporation, and/or KIA Motors America, Inc. leased a dangerous vehicle to Ms. Deriso through its finance company, Defendant, KIA.

68.    Hyundai Motor Company, Hyundai Motor America, KIA Motors Corporation, and/or KIA Motors America, Inc., should not be selling vehicles to individuals such as the Plaintiff, Ms. DeRiso in which the engine: seizes, stalls, fails, and/or catches on fire.

69.   Mr. DeRiso excluded herself from this Class action by letter dated December 17, 2020.  A redacted copy of Ms. Deriso's letter excluding her from the Class Action is attached hereto as **Exhibit "B."**

70.   It is important to note, approximately a month prior to this event Ms. DeRiso had taken her car in for an oil change.

71.   The technician said, the oil they drained out didn't look right and Ms. DeRiso should take her car in for service to be inspected.

72.   It was time for the annual service (Ms. DeRiso had the car only **ONE YEAR**).

73.   Ms. DeRiso took the Kia Sorento to the Napleton KIA dealership on 3626 Northlake Blvd, Palm Beach Gardens, FL 33403 [hereinafter "KIA Dealership"], who performed the annual inspection.

74.   Ms DeRiso conveyed the concerns the technician who changed the oil mentioned, in response the mechanic at the KIA Dealership said the car had nothing wrong with it and looked great, and sent Ms. DeRiso on her way.

20

75.   Shortly thereafter (approximately 30 days) the car seized on I-95 as mentioned above.

76.   This was a terrifying event, and Ms. DeRiso is still haunted today by the shrieking sound that her Sorento made.

77.   The event has traumatized Ms. DeRiso and she will never own a KIA automobile again.

78.   Ms. DeRiso is so stressed out that any car she is driving will have an oil and engine problem that she is constantly checking the oil.

79.   It is important to mention that because of this traumatizing event, Ms. DeRiso spends more money getting the oil changed sooner than required due to the amount of anxiety the event caused her.

80.   Ms. DeRiso is always stressed that the engine will fail and that she will be at risk of being harmed and possibly killed on the busy I-95 highway.

81.   Any time Ms. DeRiso's car makes a sound, a wave of anxiety moves over her and she is completely freaked out that this is going to happen to her again!

82.    When the KIA Dealership contacted Ms. DeRiso the manager asked for her oil change receipts.  She provided them, and the representative from the KIA Dealership said it wouldn't be a problem and the car would be repaired.

83.    Ms DeRiso later called the KIA Dealership to find out when her car would be returned to her.

84.    Ms. DeRiso was told the manager had been fired and she was put with another representative to be handled.

85.    Over time the new person at the KIA Dealership, Ms. DeRiso was communicating with was also let go.  It happened again after that!

86.    The KIA Dealership cleaned house and no one who was left employed at the KIA Dealership that was aware of Ms. DeRiso's situation.

87.    Kia told Ms. DeRiso that they would not make the repairs and said Ms. DeRiso was responsible for them.

88.    The car was one year old, 2016.

89.    The engine failure happened June 30, 2017.

90.    The car also has a 10 year or 100k mile warranty.

22

91.    Not only was Ms. DeRiso's life put at risk, none of the warranties were honored by Hyundai Motor Company, Hyundai Motor America, KIA Motors Corporation, and/or KIA Motors America, Inc.

92.    Next, the billing department with KIA FINANCE contacted Ms. DeRiso and advised her that she needed to make a payment for her lease.

93.    Ms. DeRiso advised she would be happy to pay it when she had a car to drive around again.

**KIA FINANCE'S COLLECTION LETTER**

94.    On or about January 5, 2018, KIA FINANCE sent a debt collection letter stating that Ms. Deriso owed KIA FINANCE $10,108.36.  Around January 5, 2018, KIA FINANCE contacted Ms. Deriso by phone and advised her that she owed $10,108.36.  In response advised KIA FINANCE that she wasn't paying because their car was faulty, and because the vehicle was under warranty and they were responsible to fix it.  A copy of the KIA FINANCE letter is attached hereto as **Exhibit "C."**

95.    They did not fix it and they stopped calling.

23

96.   Subsequent to June 30, 2017 when Ms. DeRiso went to get the tag off her car at the lot for her new vehicle she discovered that her tag had been taken with the car.

97.   KIA FINANCE stole Ms. DeRiso's tag, leaving her with another bill to pay for a new tag.

98.   Not only has Ms. DeRiso been emotionally impacted by the events that took place on or around June 30, 2017, but to make matters worse – Ms. DeRiso discovered that in January of 2020, KIA FINANCE was furnishing derogatory inaccurate information to the credit reporting agencies regarding the subject debt.

99.   In response, to the Defendant's January 5, 2018 debt collection letter on December 17, 2020, the Plaintiff sent a dispute to the Defendant advising the Defendant of the events that took place and also informing the Defendant that they are seeking to collect a debt that is not legitimate" and that Defendant was reporting to inaccurate information to Plaintiff's credit reports.  A copy of this redacted letter is attached hereto as **Exhibit "D."**

100. The Defendant did not respond Ms. DeRiso's December 17, 2020 dispute letter.

24

101. As noted above, though the debt of Defendant is not legitimate, Ms. DeRiso discovered that the Defendant has been providing derogatory and inaccurate statements and information relating to Ms. DeRiso's credit history to various credit reporting agencies, as that term is defined by 15 U.S.C. 1681a(f).  More specifically, the Defendant has been reporting the subject debt as charged-off to Experian, Equifax and TransUnion.  A copy of the Defendant's reporting is attached hereto as **Exhibit "E."**

102. Defendant is aware that the credit reporting agencies to which they are providing this information are going to disseminate this information to various other persons or parties who will be reviewing this information for the purpose of extending credit, insurance or employment.

103. The inaccurate information of which Ms. DeRiso complains is an account, or trade-line, that reflects Ms. DeRiso has a defaulted on a debt with Defendant. Specifically, Ms. DeRiso asserts that she is not liable to the Defendant as her car malfunctioned and could not be repaired.

104. Despite the foregoing, Defendant has been reporting the account as a charge off while the result being that Defendant was communicating to potential creditors that Ms. DeRiso does not have the propensity to pay her bills. (hereinafter "the inaccurate information")

105. The inaccurate information negatively reflects upon Ms. DeRiso, Ms. DeRiso's credit repayment history, Ms. DeRiso credit worthiness.

106. Credit reports containing the inaccurate information have been and continue to be disseminated to various persons and credit grantors, both known and unknown.

107. The Defendant failed to respond to Ms. DeRiso's December 17, 2020 letter and the Defendant failed to correct the inaccurate reporting and therefore on April 1, 2022, Ms. DeRiso, disputed the inaccurate information with the three (3) major credit reporting agencies, Equifax Information Services, Inc (hereinafter, "Equifax"), Experian Information Solutions, Inc, (hereinafter, "Experian") and Trans Union, LLC (hereinafter, "Trans Union) by written communication to their respective representatives and by following the aforementioned reporting agencies' established procedures for

disputing consumer credit information.  A redacted copy of this letter is attached hereto as **Composite Exhibit "D."**

108. Upon information and belief, within five (5) days of Ms. DeRiso disputing the inaccurate information with Equifax, Equifax notified Defendant that Ms. DeRiso disputed the inaccurate information and the nature of Ms. DeRiso's dispute.

109. Defendant received notification from Equifax that Ms. DeRiso disputed the inaccurate information and the nature of Ms. DeRiso's dispute.

110. Upon information and belief, Defendant received from Equifax, notice of Ms. DeRiso's dispute by an Automated Consumer Dispute Verification Notice.

111. Upon information and belief, Defendant received from Equifax additional information and documentation that Equifax had received from Ms. DeRiso relative to and in support of Ms. DeRiso dispute.

112. Defendant then and there owed Ms. DeRiso a duty to assist the Equifax in a reinvestigation into the disputed information being reported about Ms. DeRiso by Defendant.

27

113. Though Equifax provided the Defendant with all information and documentation the Defendant failed to properly investigate the matter, instead the Defendant verified the debt to Equifax and Ms. DeRiso.

114. Upon information and belief, within five (5) days of Ms. Gomez disputing the inaccurate information with Experian, Experian notified Defendant that Ms. DeRiso disputed the inaccurate information and the nature of Ms. DeRiso's dispute.

115. Defendant received notification from Experian that Ms. DeRiso the inaccurate information and the nature of Ms. DeRiso 's dispute.

116. Upon information and belief, Defendant received from Experian, notice of Ms. DeRiso's dispute by an Automated Consumer Dispute Verification Notice.

117. Upon information and belief, Defendant received from Experian additional information and documentation that Experian had received from Ms. DeRiso relative to and in support of Ms. DeRiso's dispute.

28

118. Defendant then and there owed Ms. DeRiso a duty to assist Experian in a reinvestigation into the disputed information being reported about Ms. DeRiso by Defendant.

119. Though Experian provided the Defendant with all information and documentation the Defendant failed to properly investigate the matter, instead the Defendant verified the debt to Experian and Ms. DeRiso.

120. Upon information and belief, within five (5) days of Ms. DeRiso disputing the inaccurate information with Trans Union, Trans Union notified Defendant that Ms. DeRiso disputed the inaccurate information and the nature of Ms. DeRiso's dispute.

121. Defendant received notification from Trans Union that Ms. DeRiso disputed the inaccurate information and the nature of Ms. DeRiso's dispute.

122. Upon information and belief, Defendant received from Trans Union, notice of Ms. DeRiso's dispute by an Automated Consumer Dispute Verification Notice.

123. Upon information and belief, Defendant received from Trans Union additional information and documentation that Trans Union had received from Ms. DeRiso relative to and in support of Ms.

29

DeRiso's dispute.

124. Defendant then and there owed Ms. DeRiso a duty to assist Trans Union in a re-investigation into the disputed information being reported about Ms. DeRiso by Defendant.

125. Though Trans Union provided the Defendant with all information and documentation the Defendant failed to properly investigate the matter, instead the Defendant verified the debt to Trans Union and Ms. DeRiso.

126. Notwithstanding Ms. DeRiso's efforts and Defendant's duties, Defendant continued to publish and disseminate such inaccurate information to various credit reporting agencies.

127. Despite Ms. DeRiso's efforts to date, Defendant has nonetheless deliberately, willfully, intentionally, recklessly and negligently repeatedly failed to perform reasonable re-investigations of the above dispute as required by the FCRA, has failed to remove and/or correct the inaccurate information, has failed to note the disputed status of the inaccurate information, and has continued to report the derogatory inaccurate information about Ms. DeRiso.

128. Ms. DeRiso's credit reports and file have been obtained from Defendant and have been reviewed many times by prospective and existing credit grantors and extenders of credit, and the inaccurate information has been a substantial factor in precluding Ms. DeRiso from receiving many different credit offers and opportunities, known and unknown, and from receiving the most favorable terms in financing and interest rates for credit offers that were ultimately made.

129. As a result of Defendant's conduct, Ms. DeRiso has suffered actual damages in the forms of lost credit opportunities, harm to credit reputation and credit score, and emotional distress.

130. As a result of Defendant's conduct, Ms. DeRiso's credit Scores have decreased.  Additionally, as a result of Ms. DeRiso's dispute of Defendant's tradelines and then Defendant subsequently verifying the tradelines, Ms. DeRiso's credit score dropped 23 points.  **See Exhibit "F."**

## Plaintiff's Injuries-In-Fact under the FCRA

131. Defendants' actions and omissions have resulted in Ms. DeRiso having a decreased credit score, which resulted in her paying increased interest on any approved credit applications

following her two written disputes.

132. This negative effect on Plaintiff's credit score subjected her to either being denied credit or receiving less favorable credit terms than she otherwise would when she applied for credit after submitting her written disputes.

133. Further, courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III. *Pedro v. Equifax, Inc.,* 868 F.3d 1275 (11th Cir. 2017) ("[H]er credit score dropped 100 points as a result of the challenged conduct. Because Pedro alleged that she suffered an injury in fact, she has standing to pursue her complaint."); *Diedrich v. Ocwen Loan Servicing, LLC, 839 F.3d 583* (7th Cir. 2016) (standing where Plaintiffs alleged that they "have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate"); *Santangelo v. Comcast Corp., 162* F. Supp. 3d 691 (N.D. Ill. 2016) ("a depleted credit score is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing"); *Binns v. Ocwen Loan Servicing, LLC,* No. 14- 01764, 2015 U.S. Dist. LEXIS 132743, 2015 WL 5785693, at *9 (S.D. Ind. Sept. 30, 2015) ("injuries to plaintiffs'

credit scores and reputations were considered intangible harms");
*Rothman v. U.S. Bank Nat'l Ass'n,* No. 13-03381, 2014 U.S. Dist.
LEXIS 141100, 2014 WL 4966907, at *5 (N.D. Cal. Oct. 3, 2014)
("Injury to a credit score is sufficient to constitute 'actual
damages'"); *Green v. RentGrow, Inc.,* No. 2:16cv421, 2016 U.S. Dist.
LEXIS 166229 ("A decrease in credit score may still establish an
injury in fact sufficient to confer standing"); *Adams v. Fifth Third
Bank,* No. 3:16-CV-00218-TBR, 2017 U.S. Dist. LEXIS 18932 (W.D.
Ky. Feb. 9, 2017) ("Plaintiffs' allegations of lower credit scores … are
sufficient to allege a concrete injury-in-fact for the purposes of
standing under Article III."); and, *Coulbertson v. Experian Info. Sols.,
Inc.,* No. 16-cv-05672-RS, 2017 U.S. Dist. LEXIS 69484 (N.D. Cal.
Mar. 24, 2017) ("At a minimum, Coulbertson has alleged a
sufficient injury-in-fact through her claim that her credit score
suffered as a result of the credit report she disputes").

134. At all times pertinent hereto, Defendant was acting by and
through its agents, servants and/or employees who were acting
within the course and scope of their agency or employment, and
under the direct supervision and control of Defendant herein.

135. At all times pertinent hereto, the conduct of Defendant, as well as that of its agents, servants and/or employees, was malicious, intentional, willful, reckless, and in grossly negligent disregard for federal and state laws and the rights of Ms. DeRiso herein.

136. Defendant violated sections 1681n and 1681o of the FCRA by engaging in the following conduct that violates 15 U.S.C. §1681s-2(b):

   a. Willfully and negligently failing to conduct an investigation of the inaccurate information that Ms. DeRiso disputed;

   b. Willfully and negligently failing to review all relevant information concerning Ms. DeRiso 's account provided to this Defendant;

   c. Willfully and negligently failing to report the inaccurate status of the inaccurate information to all credit reporting agencies;

   d. Willfully and negligently failing to properly participate, investigate and comply with the reinvestigations that were conducted by any and all credit reporting agencies concerning the inaccurate information disputed by Ms. DeRiso;

   e. Willfully and negligently continuing to furnish and disseminate inaccurate and derogatory credit, account and other information concerning the Ms. DeRiso to credit reporting agencies and other entities despite knowing that said information was inaccurate; and,

   f.  Willfully and negligently failing to comply with the
       requirements imposed on furnishers of information
       pursuant to 15 U.S.C. §1681s-2(b).

137. Defendant's conduct was a direct and proximate cause, as well as a substantial factor, in causing the injuries, damages and harm to Ms. DeRiso that are outlined more fully above, and as a result, Defendant is liable to compensate Ms. DeRiso for the full amount of statutory, actual and punitive damages, along with attorneys' fees and costs, as well as such other relief permitted by law.

## I.  **JURY DEMAND**

138. Plaintiff, Ms. DeRiso hereby demands a trial by jury on all issues so triable.

## II.  **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs, GINA DERISO RINIKER, by and through her attorneys, respectfully prays for Judgment to be entered in their favor of Plaintiff and against Defendant as follows:

   a. All actual compensatory damages suffered;

   b. Statutory damages;

   c. Punitive damages;

35

d. Plaintiffs' attorneys' fees and costs; and,

e. Any other relief deemed appropriate by this Honorable Court.

Respectfully submitted,

𝕽𝖔𝖇𝖊𝖗𝖙 𝕮. 𝕲𝖎𝖓𝖉𝖊𝖑 𝕵𝖗., 𝕻.𝕬.

By: _s/ Robert C. Gindel, Jr._
            Attorney for Plaintiff

Dated: June 2, 2022

Robert C. Gindel, Jr.
FL Bar No. 470740
ROBERT C. GINDEL, JR., PA
1500 Gateway Blvd, Suite 220
Boynton Beach, FL 33426
Telephone:    (561) 649-2344
Facsimile:     (561) 965-8550
E-Mail: robertgindel@robertgindel.com